SIDLEY AUSTIN LLP    Hearing: May 17, 2011 at 11:00 a.m. (prevailing Eastern Time)
Lee S. Attanasio
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

Attorney for CT Investment Management Co., LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| COZUMEL CARIBE, S.A. de C.V., | Case No. 10-13913 (MG) |
| Debtor in a Foreign Proceeding. | **Ref. Docket No. 54** |

**CT INVESTMENT MANAGEMENT CO., LLC'S OBJECTION TO MOTION OF
NEMIAS ESTEBAN MARTINEZ MARTINEZ, AS FOREIGN REPRESENTATIVE
OF COZUMEL CARIBE S.A. de C.V. FOR AN ORDER PURSUANT TO
11 U.S.C. §§ 1507 AND 1521 DIRECTING TURNOVER OF ASSETS**

CT Investment Management Co., LLC ("CTIM"), as special servicer on behalf of LaSalle Bank N.A. ("LaSalle"), trustee under that certain Note Indenture,[1] dated October 3, 2006, and that Cash Management Agreement, dated October 3, 2006, by and through its attorneys, submits this objection (the "Objection") to the Motion of Nemias Esteban Martinez Martinez (the "Foreign Representative"), as Foreign Representative of Cozumel Caribe, S.A. de C.V.'s (the "Debtor") Motion for an Order Pursuant to 11 U.S.C. §§ 1507 and 1521 Directing Turnover of Assets (the "Motion"). In support of its Objection, CTIM has filed the Declarations of Deborah Ginsberg (the "Ginsberg Declaration") and Francisco Xavier Cortina Cortina (the "Cortina Declaration") concurrently herewith. In further support, CTIM respectfully states as follows:

---

[1] All Capitalized terms used but not defined herein shall have the same meaning ascribed to them in *CT Investment Management Co., LLC's Objection to Cozumel Caribe's Ex Parte Application of Foreign Representative for Entry of Provisional Relief Pursuant to 11 U.S.C. § 1519* [Docket No. 18] (the "Objection to the Provisional Relief Application"), *CT Investment Management Co., LLC's Objection To Cozumel Caribe's Application Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and Additional relief Pursuant to 11 U.S.C. § 1521* (the "Objection to the Recognition Petition"), or the Motion, as applicable.

**INTRODUCTION**

1. From the outset of this case, the Foreign Representative's goal has been clear – expatriate as much cash as possible to Mexico. The Motion is merely another attempt to advance that goal. As this Court may recall, when the petition commencing this case was filed, the Debtor similarly relied on an order from the Mexican court in seeking overreaching *ex parte* injunctive relief from this Court aimed at taking possession and control of all funds in the Cash Management Accounts belonging not only to the Debtor but also certain of the Debtor's non-debtor affiliates (the "Non-Debtor Affiliates," and together with the Debtor, the "Costamex Group").[2] The Debtor also proposed similarly overreaching relief in its proposed order recognizing the Concurso Proceeding. It was only after CTIM, and the Court, objected to such relief that the Debtor and Foreign Representative agreed to appropriately tailor the scope of the injunctive relief and the proposed recognition order to comply with the Bankruptcy Code. (*See* Recognition Order at ¶ 3.)

2. As was made clear on the record by counsel to CTIM and the Debtor at the hearing on August 3, 2010, the consensual terms of the Initial Order (and, eventually, the Recognition Order) were intended to preserve the status quo during the Debtor's reorganization under Mexican law, thereby providing CTIM with some measure of adequate protection as to its cash collateral.[3] This was – and is – critical because, as the Court may further recall, upon filing

---

[2] Mr. Gleit: Yes, Your Honor. I believe the point of the proceedings in the U.S. is to maintain the status quo. We have a reorganization proceeding. And Ms. Attanasio and I will agree as to whether the effect of the foreign proceeding or not based on the stage it's in. We have a restructuring proceeding that's going on in Mexico right now. And certain orders have been entered. At least one order that we are addressing here has been entered by that Court. And we are seeking enforcement of that order with respect to the funds in the lockbox and the cash management.
Court: Well, enforcement to the extent of an injunction that maintains the status quo. I'm not enforcing the terms of that order that would permit you to seize the funds in the lockbox account – the two lockbox accounts. That I've made clear. (Hr'g Transcript, August 3, 2010, 15:15-25; 16:1-4)
[3] Mr. Gleit: Yes, Your Honor. I believe the point of the proceedings in the U.S. is to maintain the status quo. (Hr'g Transcript, August 3, 2010, 15:15-16);

the Concurso Petition, the Debtor breached its obligations under the Cash Management Agreement (and other financing documents) and began diverting all operating revenues that were contractually required to be deposited into Cash Management Accounts in the United States into its own accounts in Mexico. (Ginsberg Decl. at ¶ 7.) As a result, since the date of the Concurso Petition, no further funds have come into the United States, and the Debtor has operated its business entirely outside the negotiated terms of its financing agreements, which are governed by United States (and specifically New York) law.[4] The Debtor (and the Non-Debtor Affiliates) also have breached the financing agreements by failing to provide reporting or other information required under the financing agreements. Specifically, despite CTIM's request, the Debtor and the Foreign Representative have provided no information regarding hotel revenues and expenses, insurance coverage, or the accounts into which the Debtor's revenues are being deposited (e.g., where the cash is being held, whether the cash is being held in a segregated account, the balance of each such account, etc.) (*Id.* at ¶ 8.). To further demonstrate the complete lack of information or cooperation on the part of the Debtor, neither the Debtor nor the Foreign Representative or either of their respective U.S. or Mexican counsel, contacted CTIM to discuss in advance the relief sought in the Motion or the existence of the order obtained – also without notice – in Mexico. (*Id. at* ¶ 9.)

---

Ms. Attanasio: … Counsel proposed a modified and more narrow order, and one which CTIM is willing to consent to really for the limited purpose of ensuring that there's no disposition of funds that are currently held in the United States (Hr'g Transcript, August 3, 2010, 19:8-12);

Ms. Attanasio: … I think the purpose of today's order, and our willingness to consent to the scope of today's order is really to simply maintain the funds in that account, preserve the status quo and try and sort some of the more complex issues out as we move forward. (Hr'g Transcript, August 3, 2010, 23:24-25; 24:1-3)

[4] It cannot be disputed that CTIM and the Debtor intended the financing documents to be governed by New York law and protected by the courts of the state of New York. (Note Indenture, § 14.04; Cash Management Agreement, § 8.11.)

3. The sole bases for the Foreign Representative's latest attempt to avoid its contractual obligations, the strictures of chapter 15 and the Recognition Order negotiated with CTIM and approved by this Court are an attached order from the Mexican Court and an argument that VAT is not property of the estate. Despite the Foreign Representative's statements to the contrary, the Mexican Turnover Order (i) was obtained through flawed procedures in Mexico as it was not served on CTIM (in the United States or Mexico), (ii) is not binding on CTIM (or this Court), and (iii) is not a final order. With regard to amounts collected as VAT, the Motion relies on two fundamentally flawed premises: first, that such amounts are not "property of the estate" and second, that the Debtor and the Foreign Representative could be subject to civil or criminal penalties for failing to pay the VAT amounts. As to the first premise, the Motion ignores entirely the terms governing the financing agreements, and the fact that the claimed amounts are in controlled accounts in the United States, commingled with other funds of the Debtor and Non-Debtor Affiliates, and subject to liens securing the financing obligation. As to the second premise, despite the Foreign Representative's dramatic allegations of potential loss of personal liberty as a result of the Debtor's failure to pay VAT, the Foreign Representative neglects to mention that, as a matter of Mexican insolvency law, the Debtor's obligation to pay "pre-petition" VAT liabilities are stayed during the pendency of the Concurso Proceeding. (Cortina Decl. at ¶ 7.)

4. At base, the Turnover Motion relies on fundamental omissions and faulty or strained interpretations of both Mexican and U.S. law. First and foremost, the Foreign Representative relies on the Mexican Turnover Order as the basis for his requested relief and represents that such order is a final order. In fact, consistent with the Debtor's prior conduct in this case, CTIM was not served with notice of the relief requested in the Mexican Turnover

Order and only found out about such order when it obtained a copy of the Motion. (Ginsberg Decl. at ¶ 5.) The period within which to challenge such order has not, therefore, even begun to run, much less passed. (Cortina Decl. at ¶ 5.) Second, the basis for the Mexican Turnover Order has been misrepresented. There is no pressing need to pay VAT obligations, if any, as payment of such debts has been stayed by Mexican law, a reality confirmed by the fact that the Motion makes clear that the Debtor has no intention of making any immediate payments to the Mexican government. Third, the amounts collected as VAT are not "trust funds" under U.S. law, once they are delivered to and commingled with other Debtor and Non-Debtor Affiliate funds in the Cash Management Accounts, as specifically contemplated by the governing financing documents; they are simply another obligation payable by the Debtor – not by CTIM. Finally, the Foreign Representative has failed to meet its burden of showing that the expatriation of assets is consistent with the Bankruptcy Code and governing United States policy since there is not a shred of evidence in the Motion that CTIM would, or could, be adequately protected – or even sufficiently protected – if such funds were transferred to Mexico. Under the facts of this case and governing U.S. law, the Motion must be denied.

## FACTS

5. As more fully set forth in the Objection to the Provisional Relief Application [Docket No. 18], the Ginsberg Declaration (as defined in the Objection to the Provisional Relief Application) [Docket No. 19], and the Objection to the Recognition Petition [Docket No. 30], the Debtor and the Non-Debtor Affiliates executed two (2) promissory notes in the aggregate amount of $103 million (the "Promissory Notes") in order to finance the operations of the Hotel Park Royal Cozumel and certain properties owned by the Non-Debtor Affiliates. In connection with the Promissory Notes, the Debtor and the Non-Debtor Affiliates, on the one hand, and LaSalle, on the other, entered into the Note Indenture and Cash Management

5

Agreement on October 3, 2006, in the State of New York.[5] As is typical in financings of this type, the revenues generated from the Debtor's operations were deposited in certain Cash Management Accounts (described below). Pursuant to the Cash Management Agreement, the obligations of the Debtor and Non-Debtor Affiliates are secured by a first priority continuing security interest in and to substantially all assets in the Cash Management Account. After substantial and continuing defaults under the financing document, CTIM assumed the responsibilities of special servicer on July 3, 2009.

### A. Description of Cash Management System.

6. In connection with the Cash Management Agreement and the Note Indenture, the Debtor and the Non-Debtor Affiliates entered into two (2) lockbox arrangements with respect to rents and other revenues generated from the Properties.

> (a) Pursuant to the Administration, Guaranty and Source of Payment Trust Agreement Num. F/231452 (the "Pesos Lockbox Agreement"), dated October 26, 2006, between the Debtor and the Non-Debtor Affiliates, collectively, as the Costamex Group, Operación y Supervisión de Hoteles, S.A. DE C.V., as manager ("OPYSA"), LaSalle, as first beneficiary, and HSBC México, S.A., Institucion de Banca Múltiple, Groupo Financiero HSBC, Division Fiduciaria, as the Mexican trustee, the Mexican trustee, acting for the benefit of the first beneficiary, established a Pesos Lockbox Account with respect to each Property, into which the Debtor, the Non-Debtor Affiliates and OPYSA agreed to cause all rents collected in pesos and all over the counter rents generated from each Property to be deposited. If there were sufficient funds on deposit in the Cash Management Account to pay (i) monthly tax and insurance deposits, (ii) any then due and owing fees to the trustee and agent, (iii) monthly debt service amounts under the financing, (iv) monthly repair reserve amounts, (v) any default interest amounts, and (vi) amounts necessary to cover any extraordinary expenses at the Properties, then, on each business day, all funds on deposit in the Pesos Lockbox Account were transferred to one or more accounts of the Debtor and Non-Debtor Affiliates for the payment of Approved Operating Expenses. However, following an Event of Default, the Debtor and Non-Debtor Affiliates were only entitled to transfer from the Pesos Lockbox Account an amount equal to the Monthly Approved Operating Expenses for each calendar month, as set forth in the

---

[5] Copies of the Note Indenture and Cash Management Agreement are attached as Exhibits 1 and 2, respectively, to the Declaration of Agustin Garcia Bolanos Cacho [Docket No. 4].

approved budget, and all other amounts on deposit in the Pesos Lockbox Account to be transferred to the Cash Management Account for disbursement pursuant to the terms and provisions of the Cash Management Agreement. (Cash Management Agreement, § 3.3(c).) If at any time there were insufficient funds on deposit in the Cash Management Account to make the monthly payments set forth in clauses (i) through (vi) above, then all amounts on deposit in the Pesos Lockbox Account were transferred to the Cash Management Account and the Debtor and Non-Debtor Affiliates were not entitled to any disbursement of funds from the Pesos Lockbox Account. (Cash Management Agreement, § 3.3(f).)

(b) In addition to the Pesos Lockbox Account, the Debtor and Non-Debtor Affiliates established a Dollars Lockbox Account with respect to each Property. Pursuant the certain Clearing Bank Instruction Letter (Dollars), dated as of October 3, 2006 (the "Dollars Lockbox Agreement"), by and between the Debtor and the Non-Debtor Affiliates, as Costamex Group, LaSalle, as trustee, OPYSA, as manager, and Hyatt de México, S.A. DE C.V. ("Hyatt Manager"), as manager, the Applicant and Non-Debtor Affiliates and managers agreed to cause all rents generated from the Properties (other than over the counter rents), in any currency other than pesos, to be deposited into the applicable Dollars Lockbox Account. (Cash Management Agreement, § 3.1.) On each business day, all amounts on deposit in the Dollars Lockbox Account were swept to the Cash Management Account for disbursement pursuant to the terms of the Cash Management Agreement. (Cash Management Agreement, § 3.3(b).)

7. The Cash Management Account contains several subaccounts including the Tax and Insurance Escrow Subaccount. (Cash Management Agreement, 2.1(b)). Under the Note Indenture, the only taxes that were required to be accounted for in the Tax and Insurance Escrow were "real estate and personal property taxes, assessments, water rates or sewer rents. . . ." (Note Indenture, pg. 30.) As such, none of the Borrowers separately identified VAT amounts as and when deposited, and neither the Note Indenture nor the Cash Management Agreement required CTIM to segregate funds for the Debtor to pay its VAT or any other taxes or obligations not specifically delineated in the Note Indenture.

**B. The Mexican Proceeding**

8. On May 21, 2010, the Foreign Representative filed a petition to obtain a "business reorganization judgment" authorizing the commencement of a Concurso Mercantil

Proceeding (the "Concurso Petition") in the Third District Court for the State of Quintana Roo (the "Mexican Court"). The Mexican Court entered an initial *ex parte* order staying any action against the Debtor and the Non-Debtor Affiliates and their respective assets in both the United States and Mexico on May 27, 2010 (the "Mexican Order"). CTIM received no notice of the filing of the Concurso Petition or of the Mexican Order until reference to both were made in a letter received by CTIM nearly a month later. To CTIM's knowledge, as of the date of the Motion, no Non-Debtor Affiliates have commenced insolvency or related proceedings in Mexico or the United States. (Ginsberg Decl. at ¶ 7).

9. On July 20, 2010, the Foreign Representative sought *ex parte* relief via the *Ex Parte* Application of Foreign Representative for Entry of Provisional Relief Pursuant to 11 U.S.C. § 1519, and the Court entered an Order to Show Cause and granted Applicant preliminary injunctive relief on July 21, 2010 (the "Preliminary Injunction") [Docket No. 11]. The Preliminary Injunction, as modified, was extended by the Order Granting Provisional Relief (the "Initial Order") on August 4, 2010 [Docket No. 23]. The Initial Order prohibits any party from transferring the cash in the Cash Management Account outside of the U.S. *Id.* at ¶ 1a.

10. On September 30, 2010, the Mexican Court issued its "business reorganization judgment" granting the Concurso Petition permitting Debtor to proceed with the "reconciliation" stage of the *Concurso Mercantil* Proceeding.

11. On October 20, 2010, this Court entered an agreed Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 (the "Recognition Order") [Docket No. 45]. The Recognition Order prohibits any party from transferring the cash in the Cash Management Account outside of the United States. *Id.* at ¶ 3.

12. According to the Motion, the Mexican Court issued an order on December 17, 2010, requesting that this Court enter an order directing the turn over of certain of CTIM's cash collateral (the "Mexican Turnover Order"). However, the Mexican Turnover Order was not served on CTIM, and CTIM only learned of the existence and content of the Mexican Turnover Order through the Motion filed in this Court. (Cortina Decl. at ¶ 3.) Moreover, contrary to the Foreign Representative's assertions in the Motion, the Mexican Turnover Order is not a final order under Mexican law and is not binding on CTIM. (*Id.* at ¶ 5.)

## ARGUMENT

### I. The Limited Bases Supporting the Motion Are Factually and Legally Flawed

#### A. The Mexican Turnover Order is Not Binding on CTIM

13. According to the Foreign Representative, the Mexican Turnover Order on which the Motion so heavily relies, is "final and not subject to appeal." (Motion at 34.) In reality, the Mexican Turnover Order was obtained without following proper notice and other procedures in Mexico, and is therefore not binding on CTIM. As noted above and in the Cortina and Ginsberg Declarations, neither the Debtor nor the Foreign Representative provided CTIM or its counsel with notice of the Mexican Turnover Order. (Cortina Decl. at ¶ 3; Ginsberg Decl. at ¶ 9.) Under Mexican law, litigants in a proceeding must designate a domicile or legal address in the first motion they file or in the first hearing that they attend so that the court can thereafter serve successfully any order. (Cortina Decl. at ¶ 3). While CTIM has participated in *Amparo* proceedings in Mexico, CTIM has not participated in the Concurso Proceeding and, as a matter of Mexican law, CTIM is not under the jurisdiction of the Concurso Court other than its participation in the ancillary but independent procedure followed here under Chapter 15. (*Id.*) CTIM has not, and has not been required to, appoint a domicile or designate a legal address in the Concurso Proceeding. (*Id.*) Because CTIM does not have a domicile or legal address in

Mexico, the order could not be served on CTIM in Mexico under Mexican law. (*Id.*) Therefore, the Mexican Turnover Order would have to be served on CTIM in the United States, which it was not. (Ginsberg Decl. at ¶ 9.) As such, as a matter of Mexican law the Mexican Turnover Order is not binding upon CTIM (and is not considered a final order). (Cortina Decl. at ¶ 5).

14. It is worth noting that these key allegations – that CTIM was properly served, failed to reply and the Mexican Turnover Order is therefore final – are provided without a shred of supporting evidence. Neither the Motion nor the Peniche Declaration indicates to whom service was made, or when and where such person was served, and no certificate of service is attached. It should also be noted that neither the Debtor nor its counsel ever communicated with CTIM or its counsel in Mexico or the United States regarding the requested turnover of funds in the Cash Management Accounts, notwithstanding the fact that such a turnover is directly contrary to the negotiated relief approved by this Court in the Recognition Order. (Ginsberg Decl. at ¶ 9). The Foreign Representative's attempt to rely on an ineffective order to compel this Court to reverse course and expatriate funds must be denied.

### B. The Foreign Representative Cannot Use the Mexican Turnover Order to Obtain Relief Requested

15. Even if the relief obtained in the Mexican Turnover Order were binding on CTIM, the Foreign Representative cannot use such order as a sword to divest the Debtor's secured creditors of their U.S. property rights – specifically, their security interest in amounts maintained in the Cash Management Account. In an attempt to avoid its obligation to provide adequate protection, as discussed below, the Foreign Representative seeks instead to eradicate lien rights of the Debtor's secured creditors. As the Foreign Representative is asking this Court to determine the validity of the noteholders' liens – which is akin to a declaratory action – he bears the burden of proving that the noteholders's liens are invalid. *In re Air Vectors Assoc.*,

53 B.R. 668, 685 (Bankr. S.D.N.Y. 1985) ("In a declaratory judgment it is a "general rule of law" that the plaintiff must sustain the burden of proof and thereby "bear the risk of nonpersuasion of his prima facie case."). Moreover, any challenge to such liens granted pursuant to financing documents governed by U.S. law on assets located in the United States must be brought as an adversary proceeding in this Court pursuant to Bankruptcy Rule 7001(2) – not through proceedings in Mexico. The Foreign Representative has once again failed to follow appropriate procedures or to provide CTIM (or the Debtor's secured creditors) with any measure of due process, and for this reason as well the Motion must be denied.

### C. Funds in the Cash Management Account are all Property of the Estate subject to CTIM's Lien

16. Flawed procedure aside, the Foreign Representative's position also is based on a legal fallacy. The Foreign Representative's argument that turnover is proper is premised on an argument that certain funds in the Cash Management Account are not property of the Debtor's estate and, therefore, not subject to the noteholders' security interest and the Cash Management Agreement. To support his position, the Foreign Representative cites *Begier v. I.R.S.*, 496 U.S. 53 (1990). While it is unclear whether this case law applies to situations implicating Mexican tax law, it is clear – even assuming that *Begier* controls – that the Foreign Representative cannot establish that the alleged VAT Funds are not property of the Debtor's estate. Under *Begier*, to be excluded from property of the estate, the entity seeking turn over of funds must be able to show (i) the statute at issue provides for a statutory trust and (ii) there is a nexus between the particular funds alleged to be trust property and the statutory trust. *See Begier*, 496 U.S. at 60-66. The Foreign Representative cites to documents attached as Exhibits A and B to the Peniche Declaration in support of his argument that a statutory trust is created in favor of the Mexican government on funds collected by the Debtor attributable to VAT;

however, the precedent does not support the conclusion that value added taxes are held in trust for the Mexican federal and state governments (see Cortina Decl. at ¶ 9) and, as a consequence, the Foreign Representative's argument that the VAT Amounts are not property of the estate must fail.

17. Moreover, even if the Foreign Representative could somehow establish that a statutory trust was created under Mexican law with respect to the VAT Amounts, those funds have lost their "trust fund" nature as they have been, consistent with the governing financing documents, commingled with the Debtor's other funds, as well as funds of Non-Debtor Affiliates. (See Ginsberg Decl. at ¶ 5.) As a consequence, the Foreign Representative would not be able to establish a nexus sufficient to exclude the VAT Amounts from property of the estate under the second prong of *Begier*. *See In re Spirit Holding Co., Inc.*, 166 B.R. 367, 371 (Bankr. E.D. Mo. 1994) (finding that placing sales tax into a commingled account with other operating funds was not sufficient to satisfy the nexus requirement); *In re Russman's Inc.*, 125 B.R. 520, 525 (Bankr. E.D. Tenn. 1991) (finding that trust fund taxes that were segregated into a separate escrow account had proper nexus and were not property of the estate but that commingled trust fund taxes did not satisfy the nexus test). This is yet another reason that the Foreign Representative's argument that the VAT Amounts are not property of the estate must fail.

18. Further, the financing documents do not require CTIM to separately identify or otherwise segregate VAT from the other operating revenue collected as part of the Cash Management Agreement (while the Debtor was complying with its obligations under such agreements). Additionally, the financing documents did not require CTIM to hold VAT in escrow or pay VAT directly to the Mexican government. (See Ginsberg Decl. at ¶ 5.) Thus, nothing in the financing documents treat a dollar of VAT any differently from a dollar of rent,

for example, and such documents impose no special duty or obligation on CTIM with respect to the *Debtor's* VAT obligations. To state the obvious: cash is fungible. If the VAT obligations are required to be paid now – itself a dubious position, as discussed below – they can be paid with the Debtor's funds, all of which are being collected and retained in Mexico, not with the secured noteholders' cash collateral in the United States.

## II. The Foreign Representative Has Failed Entirely to Meet it Burden Under Sections 1520 and 1521 of the Bankruptcy Code

19. Even if the Mexican Turnover Order lacked the aforementioned infirmities, its directive is not automatically binding on this Court. This Court may only order turnover of funds in the Cash Management Account if such turnover (i) comports with the Recognition Order, applying 11 U.S.C. §§ 361 and 362 to the Debtor's funds located in the United States pursuant to 11 U.S.C. § 1520, (ii) complies with Chapter 15 of the Bankruptcy Code, and (iii) is consistent with the principles of comity. Recognition Order, ¶ 3 ("Upon entry of this Order, pursuant to 11 U.S.C. § 1520, the Concurso Mercantil proceeding shall be given its full force and effect, and, among other things, (i) the protections of 11 U.S.C. §§ 361 and 362 applies to Cozumel Caribe and its assets in the United States, *including all of the funds within the Dollars Lockbox Account and the Cash Management Account* …") (emphasis added); s*ee also In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626-28 (Bankr. S.D.N.Y. 2010) (stating that relief under section 1521 can only be granted as to a secured creditor if adequate protection is given and the Bankruptcy Code and comity are otherwise satisfied). The burden is on the Foreign Representative, as the moving party, to show that the Mexican Turnover Order is proper. *See generally In re Treco*, 229 B.R. 280 (Bankr. S.D.N.Y. 1999).

20. Thus, despite the fact that the Foreign Representative sought relief solely under section 1507 of the Bankruptcy Code in blatant disregard for the provisions of the

13

Recognition Order, in order for this Court to grant the relief requested, the Foreign Representative has the burden to demonstrate that the Debtor's secured noteholders have been adequately protected pursuant to 1520. *See* Recognition Order, ¶ 3; 11 U.S.C. § 1520(a)(2); *Int'l Banking*, 439 B.R. at 627 ("In addition, Chapter 15 grants secured creditors. . . the same protections that they would enjoy in a plenary bankruptcy case. . . [T]he Administrator cannot use [the secured lenders'] cash collateral without their consent or an order of this Court. . . [and] must provide the Banks with adequate protection. . . ."); *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 639 (Bankr. E.D. Cal. 2006) ("An automatic consequence of recognition of a foreign main proceeding is that § 363 applies. As a consequence, cash collateral cannot be used without permission.") (citations omitted); *Collier on Bankruptcy*, ¶1520.01. The Foreign Representative also must demonstrate that all U.S. creditors – whether secured or not – are "sufficiently protected" pursuant to section 1521(b) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(b) (stating that U.S. creditors must be sufficiently protected before assets can be turned over to a foreign administrator); 11 U.S.C. § 1522(a) (providing that a court may only grant relief under §§ 1519 and 1521 if creditors "are sufficiently protected"); 11 U.S.C. § 1522(b) (providing that relief under sections 1519, 1520(a)(3), and 1521 may require the "giving of security or the filing of a bond"); *SPhinX*, 351 B.R. 103 at 113 n.12 (Bankr. S.D.N.Y. 2006) (requiring sufficient protection); *In re Artimm, S.r.l.*, 335 B.R. 149, 164 (Bankr. C.D. Cal. 2005) (court requiring sufficient protection before assets could be turned over to Italian proceeding).

21. To say that the Debtor has failed to meet its burden of demonstrating that the secured noteholders are adequately protected pursuant to sections 1520 and 361 of the Bankruptcy Code suggests that the Debtor even attempted to comply with United States bankruptcy law – it did not. In fact, the record is completely void of any facts that even suggest

14

that CTIM would be adequately protected in the event its collateral is turned over to the Foreign Representative. Instead, as discussed above, in an effort to end run the requirements of section 1520, the Foreign Representative attempts, again unsuccessfully and without support, to argue that the secured noteholders do not have a security interest in the VAT Amount. Indeed, given the nature of the assets sought by the Foreign Representative – cash – the only measure of adequate protection would be cash or other form of liquid security, a zero-sum game in which neither the Mexican Court nor this Court should be involved. Nor is such an exercise even required.[6]

22. First, as discussed above, the Debtor's obligation to pay its "pre-petition" VAT liability is stayed under Mexican insolvency law.[7] (Cortina Decl. at ¶7.) Second, a careful read of the Motion makes clear that despite the Foreign Representative's request to immediately expatriate the VAT Amount, the Foreign Representative is not actually going to pay the Mexican government even if turnover is ordered.[8] Instead, the money would be entrusted to the Foreign Representative to be distributed after entry of a further order by the Mexican Court. (Motion at ¶ 39). The Foreign Representative's Motion raises more questions about what really is going on in Mexico than it answers: Why does the Foreign Representative need the funds now? If VAT payments are so crucial and the Debtor has no interest in the funds – as alleged in the Motion –

---

[6] Moreover, given the lack of information available from the Debtor, CTIM has no ability to gauge what cash or other security might be available.

[7] Counsel to the Debtor previously represented that the Debtor is currently paying taxes in Mexico and that its VAT dispute relates to events prior to the petition date.

Mr. Stein: We are currently paying taxes in Mexico and that is the – the – the statement in the pleadings with respect to the taxes all relate to – all – all – all relate to events prior to the petition date. (Hr'g Transcript, October 19, 2010, 9:19-22)

[8] It is also worth noting that the Foreign Representative makes no attempt to distinguish the VAT Amount in the Cash Management Account attributable to the Debtor and the VAT Amount attributable to the Non-Debtor Affiliates. This is important as this Court lacks jurisdiction to grant the Foreign Representative relief with respect to assets of the Non-Debtor Affiliates.

15

why are the funds being paid to the Foreign Representative and not directly to the Mexican government? Has the Debtor been paying VAT out of the operating revenues it diverted to Mexico? In light of the extraordinary uncertainties surrounding the Motion, the best, and only, adequate protection is to leave the funds in the Cash Management Account until such time as the Mexican court approves a plan of reorganization and such plan is recognized by this Court.

23. Even if the Foreign Representative were successful in avoiding its adequate protection obligation – which it cannot – the Foreign Representative acknowledges that it still must meet the "sufficient protection" standard under section 1521(b). *See* 11 U.S.C. § 1521(b) (stating that U.S. creditors must be sufficiently protected before assets can be turned over to a foreign administrator); 11 U.S.C. § 1522(a) (providing that a court may only grant relief under §§ 1519 and 1521 if creditors "are sufficiently protected"); 11 U.S.C. § 1522(b) (providing that relief under sections 1519, 1520(a)(3), and 1521 may require the "giving of security or the filing of a bond"); *SPhinX*, 351 B.R. at 113 n.12; *In re Artimm, S.r.l.*, 335 B.R. 149, 164 (Bankr. C.D. Cal. 2005) (court requiring sufficient protection before assets could be turned over to Italian proceeding). Once again, the Foreign Representative's efforts to meet this acknowledged burden are little more than cursory. It is ironic, at best, that the Foreign Representative's argument under section 1521 is that it will only distribute the expatriated funds after entry of an order by the Mexican Court, on notice to CTIM. (Motion, at ¶ 39 ("[O]nce the Foreign Representative receives the VAT Amount, he will not distribute those funds absent entry of an order by the Mexican Court, on notice to CTIM, BofA and all other interested parties, directing such distribution.").) As this Court is well aware, from day one of these proceedings, notice has been an issue, with CTIM and other U.S. creditors being conveniently omitted from

16

service lists.[9] The Foreign Representative makes no other argument in support of the "sufficient protection" CTIM will enjoy, and under the circumstances of this proceeding, the possibility of participating in a future Mexican proceeding relating to cash collateral now protected by a U.S. court order is woefully inadequate. Fundamentally, in order to enter the requested order under section 1521 of the Bankruptcy Code, this Court would have to find, as a matter of U.S. law, that (a) the Debtor has no interest in the VAT Amount, (b) the secured noteholders' security interest in the VAT Amount is invalid, and (c) the Debtor has met its burden under sections 1507 and 1521 of the Bankruptcy Code. Based on the record before this Court, no such findings are possible and the relief requested must be denied.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[9] MR. GLEIT: We have not served [CTIM] with the order, Your Honor.
THE COURT: How do you expect to have a binding order from a Mexican Court where it was never served?
MR. GLEIT: The clients, Your Honor, were afraid. . . that there would be risks that C.T. could potentially setoff or take actions with respect to the money in the U.S. . . . [W]e believe that the most efficient manner in which to proceed in – by the filing the papers as is, and then we would serve C.T., and we would deal with C.T.'s issues, you know, at a later date. We –
THE COURT: Today is July 21. An order was entered in Mexico on May 27, and it's never been served on any of the parties who you're trying to restrain?
MR. GLEIT: Your Honor, actually, it was served on Bank of America. It was served on – it was served on all of the parties except for C.T. Investment Management and C.T. Corp.

Hr'g Transcript, July 21, 2010, 6-7.

Additionally, as discussed herein, the Foreign Representative also failed to properly serve (or even informally notify) CTIM about the entry of the Mexican Turnover Order (Cortina Decl. at ¶ 4.)

17

## **CONCLUSION**

For the foregoing reasons, CTIM respectfully requests that the Motion be denied in its entirety.

Dated: New York City, New York
       May 6, 2011

Respectfully submitted,

By: /s/ Lee S. Attanasio
SIDLEY AUSTIN LLP
Lee S. Attanasio
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

-and-

Brian J. Lohan
Gregory V. Demo
Brett H. Myrick
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Attorneys for CT Investment Management Co., LLC*

CH1 5879289v.12