**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**                    **FOR PUBLICATION**

| | |
|---|---|
| In re | Case No. 10-13913 (MG) |
| COZUMEL CARIBE, S.A. de C.V., | Chapter 15 |
| Debtor in a Foreign Proceeding. | |
| CT INVESTMENT MANAGEMENT CO., LLC., | Adversary Proceeding No. 11-02936 (MG) |
| Plaintiff, | |
| v. | |
| COZUMEL CARIBE, S.A. de C.V., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR ENTRY OF ORDER EXTENDING COMITY AND STAYING PROCEEDINGS**

*A P P E A R A N C E S:*

SIDLEY AUSTIN LLP
*Counsel for Plaintiff CT Investment Management Co., LLC*
787 Seventh Avenue
New York, New York 10019
By:    Lee S. Attanasio, Esq.
      Martin B. Jackson, Esq.
      Brian J. Lohan, Esq. (admitted *pro hac vice*)

JONES DAY
*Attorneys for the Foreign Representative Nemias Esteban Martinez Martinez*
222 East 41st Street
New York, New York 10017
By:    Pedro A. Jimenez, Esq.
      Jennifer J. O'Neil, Esq.

JONES DAY

*Attorneys for the Foreign Representative Nemias Esteban Martinez Martinez*

325 John J. McConnell Boulevard, Suite 600

Columbus, Ohio 43215

By:    Todd Swatsler, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff CT Investment Management Co., LLC ("CTIM") filed an adversary complaint (the "Complaint") against Cozumel Caribe, S.A. de C.V. ("Cozumel Caribe" or "Debtor"). Cozumel Caribe is the debtor in a foreign proceeding pursuant to the provisions of the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act"), commenced on July 10, 2010 and currently pending before the Third District Court for the State of Quintana Roo (the "Quintana Roo District Court") Mexico (the "Concurso Proceeding"). On July 20, 2010, Nemias Esteban Martinez Martinez (the "Foreign Representative") commenced a Chapter 15 proceeding in this Court on behalf of Cozumel Caribe. On October 20, 2010, this Court entered an agreed Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 (the "Recognition Order") (Case No. 10-13913, ECF Doc. # 45). The Recognition Order prohibits any party from transferring outside of the U.S. the cash in the Cash Management Account held by CTIM in New York without further order from this Court. Recognition Order ¶ 3. The Complaint seeks a declaratory judgment that funds on deposit in the Cash Management Account are not property of the Debtor and therefore are not subject to the automatic stay. CTIM also seeks approval to exercise its rights to those funds pursuant to loan documents governed by New York law.

The Foreign Representative responded to the Complaint by filing a motion to stay the

adversary proceeding on the grounds of international comity.

      For the reasons explained below, the motion for a stay is granted on specified

conditions requiring the Debtor and the Foreign Representative to file an appropriate

proceeding in the Quintana Roo District Court within 60 days to resolve questions

identified below that are more appropriately addressed by the Quintana Roo District

Court.

## I.    BACKGROUND

      Cozumel Caribe is a Mexican company that provides hostelry and tourism services in

Mexico.  It owns and operates the Hotel Park Royal Cozumel in Cozumel, Mexico.  Cozumel

Caribe's seven non-debtor affiliates,[1] also organized under the laws of Mexico, own and

operate other vacation and resort properties throughout Mexico.  While the Debtor and each

of the Non-Debtor Affiliates (together, the "Companies") own and operate separate resort

properties, collective timeshare interests in the properties are sold to prospective timeshare

owners, allegedly enhancing the value of each property, since timeshare owners may choose

to vacation at any property operated by any of the Companies.  According to the Debtor, "the

viability and success of the timeshare arrangement in which Cozumel Caribe participates

depends on the ongoing appeal of all properties operated by the Companies." *See* Declaration

of Raul Garcia Herrera (the "Herrera Declaration") ¶ 4 (ECF Doc. # 4).

      The current dispute centers on the effect of the Concurso Proceeding on the debt

repayment obligations of the Companies in connection with a $103 million secured loan for

---

[1]      The seven non-debtor affiliates are Promotora de Inmuebles del Caribe, S.A. de C.V.; Consorcio Imnobiliario Cancun, S.A. de C.V.; Desarrollo Turistico Piramides Cancun, S.A. de C.V.; Imnobiliaria Cancun Caribe, S.A. de C.V.; Comercializadora Y Desarro Lladora Ocean, S.A. de C.V.; Desarrolladora Imnobiliariadel Sur, S.A. de. C.V.; and Servicios Administrativos Etisa, S.A. de C.V. (collectively, the "Non-Debtor Affiliates").

which the Debtor and the Non-Debtor Affiliates are joint obligors.  As explained further

below, as part of the security for the $103 million loan, the Debtor and the Non-Debtor

Affiliates were required to deposit hotel revenues in various lock box accounts.  The Cash

Management Account in New York is controlled by CTIM, as special servicer for the loan.

The Debtor and the Non-Debtor Affiliates have defaulted on the loans.  CTIM seeks to

recover some or all of the funds in the Cash Management Account based on the loan defaults.

No debt service payments have been made by the Debtor or by the Non-Debtor Affiliates for

several years.  The Non-Debtor Affiliates ceased depositing hotel revenues in the lock box

accounts as they are contractually obligated to do.  Only Cozumel Caribe filed a bankruptcy

proceeding in Mexico, but, as explained below, on May 27, 2010, the Debtor obtained an *ex*

*parte* order from the Quintana Roo District Court barring CTIM or any other party from

taking any action to collect any of the debt from property of the Debtor or the Non-Debtor

Affiliates, specifically including any funds in the Cash Management Account (the "May 27

Order," or the "Precautionary Measures").  These so-called Precautionary Measures remain in

place and have so far prevented CTIM from applying any of the funds on deposit in the Cash

Management Account to any of the debt.  A fuller explanation of the loans, loan

documentation, the accounts and the Precautionary Measures are necessary to place the

current dispute in context and are discussed below.

### A.  The $103 Million Loan

On October 3, 2006, the Debtor and the Non-Debtor Affiliates  (collectively, the

"Borrowers") executed two (2) promissory notes in the aggregate amount of $103 million (the

"Promissory Notes") to finance the operations of the Hotel Park Royal Cozumel and certain

properties owned by the Non-Debtor Affiliates.  In connection with the Promissory Notes, the

4

Borrowers, on the one hand, and LaSalle Bank N.A. ("LaSalle" or the "Trustee"), [2] on the other, entered into a note indenture, dated October 3, 2006 (the "Note Indenture") and a cash management agreement, dated October 3, 2006 (the "Cash Management Agreement," and together with the Promissory Notes and the Note Indenture, the "Loan Documents") governed by New York law. Pursuant to section 2.1(a) of the Cash Management Agreement and section 2.4(a) of the Notes, the Companies established (i) one account with LaSalle into which all Dollar-denominated rents from all properties were deposited on a daily basis (the "Dollars Lockbox Account") and (ii) one account with Institucion de Banca Multiple into which all Pesos-denominated rents and over-the-counter rents from all properties were deposited on a daily basis (the "Pesos Lockbox Account"). The obligations of the Borrowers under the Promissory Notes are secured by a first priority continuing security interest in and to substantially all assets in the Cash Management Account.

Funds in the Dollar Lockbox Account subsequently were swept daily into a centralized account (the "Cash Management Account"), and disbursed or applied pursuant to the terms of the Cash Management Agreement. Funds swept into the Cash Management Account were applied to one or more subaccounts, including the: (i) Tax and Insurance Escrow Subaccount; (ii) Fees Subaccount; (iii) Debt Service Subaccount; (iv) Replacement Reserve Subaccount; (v) BI Insurance Reserve Subaccount; (vi) Extraordinary Expense Subaccount; (vii) Issuers Remainder Subaccount; (viii) Excess Cash Flow Subaccount; and (ix) Alterations Subaccount. Further, Article 10 of the Note Indenture established additional reserve accounts (collectively with the subaccounts, the "Reserve Accounts"). Therefore, U.S. dollar-denominated revenues generated by each

---

[2]        Bank of America, N.A. is the successor by merger to LaSalle Bank N.A., as trustee for the Noteholders.

Borrowers' Property were swept to a centralized Cash Management Account, applied to various Reserve Accounts and pooled with the funds of the other Borrowers (including the Debtor), but not commingled with the funds of the Trustee or CTIM. Thus, the Cash Management Account and Reserve Accounts (other than the Performance Holdback, BI Holdback and Political Risk Holdback accounts, as discussed below) would contain funds generated by and/or belonging to both the Debtor and the Non-Debtor Affiliates.

Assuming sufficient funds were on deposit in the Cash Management Account to pay certain fees, fund certain reserve and deposit accounts and meet monthly debt service obligations, and no event of default or Trigger Event (as defined in the Cash Management Agreement) had occurred, funds on deposit in the Peso Lockbox Account were transferred daily to one or more accounts of the Borrowers for the payment of approved operating expenses. Following a Trigger Event, however, the Borrowers were only entitled to transfer an amount equal to the monthly approved operating expenses (as set forth in an approved budget) from the Peso Lockbox Account and all other amounts would be transferred from the Peso Lockbox Account to the Cash Management Account (and then ultimately to the Excess Cash Flow Account (as defined below)). Under the Cash Management Agreement, a Trigger Event occurs when, among other things, the Borrowers fail to meet certain financial tests, including a debt yield test and a debt service coverage ratio test. Upon the occurrence of a Trigger Event, all funds on deposit in the Dollar Lockbox Accounts and Peso Lockbox Accounts are swept into the Cash Management Account and then ultimately held in the "Excess Cash Flow Subaccount" (the "Excess Cash Flow Account").

On or about November 1, 2006, the Loan Documents were contributed to a securitization trust, pursuant to a Pooling and Servicing Agreement (the "PSA") by and among Merrill Lynch Mortgage Investors, Inc., as depositor, KeyCorp Real Estate Capital Markets, Inc. ("KeyCorp"), as servicer and special servicer, U.S. Bank National Association, as trustee, and LaSalle, as paying agent and certificate registrar.  Under this arrangement, the financing was pooled with other similar financings and the liabilities were sold to third party investors as commercial mortgage-backed securities.  KeyCorp hired Wells Fargo Bank, N.A. ("Wells") to act as sub-servicer on its behalf with responsibility for the day-to-day administration of the financing, including enforcing the consent rights of the Trustee and interfacing primarily with the Borrowers.

As a result of the failure of the Borrowers to meet the required financial tests, a Trigger Event occurred in the fall of 2007.  On October 12, a "cash sweep" of the funds on deposit in the Dollar Lockbox Accounts and Peso Lockbox Accounts commenced, which remained in effect as of the Petition Date.  Thus, following the Trigger Event, excess funds in the Peso Lockbox Account and Dollar Lockbox Account from both the Defendant and Non-Debtor Affiliates were deposited in the Cash Management Account and ultimately swept into the Excess Cash Flow Account.

On or about July 3, 2009, CTIM assumed the responsibilities of KeyCorp, as special servicer, with responsibility to address material issues that arose with respect to the financing and to deal with any necessary enforcement actions.  As special servicer, CTIM endeavors to reach the funds remaining in the Cash Management Account, currently estimated at $8-9 million USD, which are the result of commingled deposits from the Companies' operations (*i.e.*, the Debtor *and* the Non-Debtor Affiliates).

### B. The Mexican Bankruptcy Proceeding

On May 21, 2010, the Foreign Representative filed a petition to obtain a "business reorganization judgment" authorizing the commencement of a Concurso Mercantil Proceeding (the "Concurso Petition") in the Quintana Roo District Court.  As part of its petition under the Mexican Business Reorganization Act, Cozumel Caribe sought certain Precautionary Measures to protect Cozumel Caribe, as well as its Non-Debtor Affiliates, as Cozumel Caribe pursued reorganization.  On May 27, 2010, the Quintana Roo District Court approved Cozumel Caribe's application and entered the *ex parte* May 27 Order that, among other things, provided a stay during the pendency of the Mexican Bankruptcy Proceeding of any actions (1) seeking to transfer, or to apply against any outstanding indebtedness, funds in to the Dollars Lockbox Account or Cash Management Account, and (2) to enforce the Guarantee Agreement.[3]  *See* Herrera Decl., ¶ 6-8.

The Foreign Representative argues that the relief was granted only after the Quintana Roo District Court determined that it was necessary in light of the nature of Cozumel Caribe's business, and the manner in which that business was intertwined and integrated with the businesses of the other Companies.  *Id.*  ¶ 7.  The May 27 Order, by its terms, required that CTIM be served with a copy of the order.  CTIM contends that it received no notice of the filing of the Concurso Petition or of the May 27 Order until reference to both was made in a letter received by CTIM nearly a month later.  It was not until sometime in July 2010 that CTIM was served with the order.  CTIM never appeared

---

[3]     Pablo Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. (together, the "Guarantors") entered into a Guarantee Agreement in connection with the development and operation of several resort properties and hotels in Mexico.  CTIM alleges that the Guarantors' obligations under the Guarantee Agreement were triggered when Cozumel Caribe, a subsidiary of Grupo Costamex, commenced the Concurso Proceeding in Mexico.

in the Quintana Roo District Court to challenge the Precautionary Measures.  Instead,

CTIM commenced an "*amparo*"[4] proceeding in a different Mexican court.

### C.  CTIM's Amparo Proceeding

On August 12, 2010, CTIM challenged the May 27 Order, insofar as its protections

extended to non-Debtor affiliates, by filing a claim with the Second District Court of the City of

Cancun  (the "Cancun District Court") for *amparo* (the "Amparo Action").  CTIM requested a

temporary and immediate suspension of the May 27 Order (the "Provisional Suspension

Request"), as well as a separate request for a temporary suspension of the May 27 Order pending

the outcome of the Amparo Action (the "Definitive Suspension Request").[5]

On August 13, 2010, the Cancun District Court denied the *ex parte* Provisional

Suspension Request based on CTIM's failure to demonstrate that it would suffer any harm in the

absence of an immediate suspension of the May 27 Order.  CTIM appealed the Cancun District

Court's denial of the Provisional Suspension Request to the Second Associate Court of the

Twenty-Seventh Circuit in Mexico (the "Mexican Appellate Court").  On August 23, 2010, the

Mexican Appellate Court affirmed the Cancun District Court's decision and ordered that the

Amparo Action be dismissed.  On September 7, 2010, the Cancun District Court denied the

Definitive Suspension Request, which was also appealed, but became moot upon Mexican

Appellate Court's dismissal of the entire Amparo Action.

CTIM maintains that the Amparo Action was dismissed because the remedy CTIM

sought was unnecessary.  According to CTIM, the Protective Measures were overbroad because

they impermissibly protected property that was solely owned by the non-Debtor Affiliates.

---

[4]      A party brings an *amparo* action in a Mexican court to seek redress for an alleged constitutional violation.

[5]      It is the Court's understanding that the Provisional Suspension Request was analogous to a temporary
restraining order, and the Definitive Suspension Request was similar to a preliminary and/or permanent injunction.

According to CTIM's interpretation of the Mexican Appellate Court's decision, the Mexican Appellate Court merely clarified that the Protective Measures did not apply to property in the Cash Management Account that was not part of the common business enterprise between the Debtor and the non-Debtor Affiliates.  During the September 14, 2012 hearing held by this Court, the Foreign Representative's counsel acknowledged that the Protective Measures did not protect funds solely owned by the non-Debtor Affiliates.  *See* September 14, 2012 Hr'g Tr. at 18:24-20:4.  The Foreign Representative argues that the dismissal of the Amparo Action leaves the May 27 Order unaltered, without any gloss or effect from any court in the Amparo Action.

### D.  Chapter 15 Petition and Request for Provisional Relief

On July 20, 2010, the Foreign Representative filed a *Chapter 15 Petition for Recognition of Foreign Proceeding* (Case No. 10-13913, ECF Doc. # 1) and also an *Ex Parte Application of Foreign Representative for Entry of Provisional Relief Pursuant to 11 U.S.C. § 1519* (*id*, ECF Doc. # 3).  On July 21, 2010, the Court entered an Order to Show Cause, granting interim relief and scheduling a preliminary injunction hearing for August 3, 2010.  The provisional relief included a provision that, pending the preliminary injunction hearing, provided:

> All persons and entities are enjoined from seizing, attaching, enforcing and/or executing security interests, liens or judgments against Cozumel Caribe's property in the United States, including all of the funds within the Dollars Lockbox Account and the Cash Management Account, or from transferring, encumbering or otherwise disposing of or interfering with Cozumel Caribe's assets or agreements in the United States, including all of the funds within the Dollars Lockbox Account and the Cash Management Account, absent further order of the Court . . . .

Order to Show Cause, dated July 21, 2010, ¶ 3.a. (*id.*, ECF Doc. # 11).

On August 4, 2010, an order was entered extending the protection of the interim

relief pending further order of the Court.  Order Granting Provisional Relief, dated

August 4, 2010 ¶ 1.a. ("August 4 Order," Case No. 10-13913, ECF Doc. # 23).  The

August 4 Order provided that "CTIM expressly reserves its right (i) to dispute Cozumel

Caribe's ownership interest in the assets subject to this Order, and (ii) to object to any

extension or modification of this Order, or the entry of any other or further order in this

proceeding. . . . .  Martinez expressly reserves the right to seek extension or modification

of this Order, or the entry of other or further orders in this proceeding."  *Id.* ¶ 8-9.  On

October 20, 2010, the Court entered an order providing that "[t]he *Concurso Mercantil*

Proceeding is recognized as a foreign main proceeding pursuant to 11 U.S.C. §§ 1517(a)

and 1517(b)(1), and all the effects of recognition as set forth in 11 U.S.C. § 1520 shall

apply."  Recognition Order ¶ 2.  The Recognition Order expressly provides that:

> The relief granted herein shall not (i) impact the security interests
> and liens, if any, existing as of July 20, 2010 on property of
> Cozumel Caribe, including all of the funds in the Dollars Lockbox
> Account and the Cash Management Account, except as set forth
> herein as to enforcement; or (ii) prohibit or restrict any action to
> enforce rights, remedies, claims or defenses against Cozumel
> Caribe in Mexico. . . . .  CTIM expressly reserves its right to
> dispute Cozumel Caribe's ownership interest in the assets subject
> to this Order.

Recognition Order ¶¶ 7-8.

### E.  CTIM's District Court Action Against the Guarantors

On September 13, 2010, CTIM filed a complaint in the United States District

Court for the Southern District of New York ("District Court") against defendants Pablo

Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. (the "Guarantor Defendants")

alleging breach of contract under a guarantee agreement (the "Guarantee Agreement")

entered into in connection with the $103 million loan for development of vacation and

resort properties throughout Mexico. *CT Inv. Mgmt. Co., LLC v. Carbonell*, No. 10-Civ.-

6872, 2012 WL 92359, at *1 (S.D.N.Y. Jan. 11, 2012) ("District Court Action"). The

Guarantee Agreement contained a "springing" or "Bad Boy" guarantee. CTIM alleged

that Cozumel Caribe's voluntary bankruptcy proceeding triggered the Guarantor

Defendants' obligations under the Guarantee Agreement. The Guarantor Defendants did

not appear to defend the District Court Action; however, before a default judgment was

entered, the Foreign Representative appeared in the case and requested that the District

Court extend comity to subsection (e) of the May 27 Order, which prevented CTIM from

exercising its rights in the Guarantee Agreement against the Guarantor Defendants.

The District Court extended comity to the May 27 Order and stayed CTIM's action

against the Guarantor Defendants. The District Court reasoned that because this Court granted

Cozumel Caribe's Recognition Order, section 1509 of the Bankruptcy Code required the District

Court to grant comity to the May 27 Order as long as doing so was not contrary to the public

policy of the United States under section 1506, which the District Court held it was not. CTIM

did not appeal the stay order.

### F.  CTIM's Adversary Complaint and the Foreign Representative's Motion for a Stay Based on Comity

CTIM's Complaint in this case was filed on December 20, 2011. The Foreign

Representative filed a motion to stay the adversary proceeding based on international

comity on January 23, 2012. ("Stay Motion," ECF Doc. # 3.) The Stay Motion resulted

in protracted proceedings in this Court, with an evidentiary hearing held on April 11 and

12, 2012, *see* April 11, 2012 Hr'g Tr. (ECF Doc. # 18) and April 12, 2012 Hr'g Tr. (ECF

Doc. # 19), followed by several rounds of supplemental briefing.[6]  The matter was taken

under submission following a hearing on September 14, 2012.

## II.    DISCUSSION

### A.  This Court Is Not Required To Give Preclusive Effect To The Comity Ruling

A threshold issue is whether the Comity Ruling has preclusive effect on this Court's

ability to determine whether the May 27 Order, in its entirety, should be granted comity in this

adversary proceeding.  The Foreign Representative argues that the Court must give the Comity

Ruling preclusive effect since CTIM and the Foreign Representative fully contested the issue

before the District Court, which ruled in favor of the Foreign Representative.  The Court

concludes that it is not bound by preclusion and must make its own determination whether to

enforce the May 27 Order.

"A fundamental precept of common-law adjudication, embodied in the related doctrines

of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and

directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent

suit between the same parties or their privies . . . .'"  *Montana v. United States*, 440 U.S. 147,

153 (1979) (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48 (1897)).

---

[6]        The following additional pleadings and declarations were submitted in connection with the Stay Motion:
Cozumel Caribe filed the Declaration of Raul Garcia Herrera in support of the Stay Motion ("Herrera Declaration,"
ECF Doc. # 4); CTIM objected to the Stay Motion (the "CTIM Objection," ECF Doc. # 12) and filed the
Declaration of Francisco Xavier Cortina Cortina ("Cortina's First Declaration" ECF Doc. # 13); Cozumel Caribe
responded to the CTIM Objection ("Caribe Response," ECF Doc. # 15) and filed the Declaration of Alfonso Peniche
(the "Peniche Declaration," ECF Doc. # 16).  Upon request by the Court for further briefing, Cozumel Caribe and
CTIM filed concurrent supplemental briefs (the "Caribe Supplemental Brief," ECF Doc. # 23; the "CTIM
Supplemental Brief," ECF Doc. # 24); CTIM filed a second Declaration of Francisco Xavier Cortina Cortina to
support the CTIM Supplemental Brief ("Cortina's Second Declaration," ECF Doc. # 25); Cozumel Caribe and
CTIM also filed concurrent supplemental reply briefs (the "Caribe Supplemental Reply," ECF Doc. # 29; the
"CTIM Supplemental Reply," ECF Doc. # 28).  Cozumel Caribe also filed a response Declaration of Alfonso
Peniche (the "Peniche's Second Declaration," ECF Doc. # 41).  Several letter submissions were also filed.  (*See*
ECF Doc. ## 22, 38, 45, 46, 49 and 50.)

> Under res judicata, a final judgment on the merits of an action
> precludes the parties or their privies from relitigating issues that
> were or could have been raised in that action.  Under collateral
> estoppel, once a court has decided an issue of fact or law necessary
> to its judgment, that decision may preclude relitigation of the issue
> in a suit on a different cause of action involving a party to the first
> case.

*Allen v. McCurry*, 449 U.S. 90, 94 (1980) (citing *Cromwell v. County of Sac*, 94 U.S. 351, 352

(1876); *Montana*, 440 U.S. at 153).  Collateral estoppel "has the dual purpose of protecting

litigants from the burden of relitigating an identical issue with the same party or his privy and of

promoting judicial economy by preventing needless litigation."  *Parklane Hosiery Co., Inc. v.

Shore*, 439 U.S. 322, 326 (1979) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402

U.S. 313, 328-29 (1971)).

In the Second Circuit, invocation of collateral estoppel to preclude relitigation of an issue

requires that "'(1) the identical issue was raised in a previous proceeding; (2) the issue was

actually litigated and decided in the previous proceeding; (3) the party had a full and fair

opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a

valid and final judgment on the merits.'"  *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir.

2006) (quoting *Purdy v. Zeldes*, 337 F.3d 253, 258 & n.5 (2d Cir. 2003)); s*ee also* RESTATEMENT

(SECOND) OF JUDGMENTS § 27 (1982).

As explained below, for several reasons, the Court concludes that it is not required to

give preclusive effect to the Comity Ruling.

Here, an analysis of each of the four factors stated above is unnecessary because the

Comity Ruling was not a final decision on the merits.  While the District Court decided to grant

comity to the May 27 order to stay CTIM's action to enforce rights against the Guarantor

Defendants, such a ruling falls short of a final determination on the merits because the District

Court never reached the merits of CTIM's action.  The District Court recognized that courts may grant a stay in favor of non-debtor affiliates.  But such stays are limited in duration and are not final in that sense.  *Quigley Co., Inc. v. Law Office of Peter G. Angelos (In re Quigley Co., Inc.)*, 676 F.3d 45, 52 ("Enjoining litigation to protect bankruptcy estates *during the pendency of bankruptcy proceedings* . . . has historically been the province of the bankruptcy courts.") (emphasis added).

Even if the Comity Ruling could be considered as a final determination on the merits, granting comity to the *entire* May 27 Order was not "necessary to support a valid and final judgment on the merits," which is the fourth factor stated above.

CTIM filed the District Court Action against the Guarantors, seeking to enforce the "springing" or "Bad Boy" guarantee contained in the Loan Documents governed by New York law.[7]  The Guarantee Agreement was triggered by the Cozumel's bankruptcy filing in Mexico. Springing guarantees are generally enforceable under New York law.  *See, e.g., First Nationwide Bank v. Brookhaven Realty Assocs.*, 637 N.Y.S.2d 418, 421 (N.Y. App. Div. 1996) (holding that a bankruptcy default clause in a non-recourse mortgage agreement that, upon filing, made the partners of the general partnership personally liable for the partnership's deficiency was "neither inequitable, oppressive, or unconscionable"); *G3-Purves St., LLC v. Thomson Purves, LLC*, 2011-03719, 2012 WL 4900846, at *3 (N.Y. App. Div. Oct. 17, 2012) (stating "contrary to the guarantors' contention, the carve-out language in the loan agreement was unambiguous and provided for personal liability for a violation of certain enumerated exceptions, including defined 'springing recourse events'").  The District Court analyzed whether the enforcement of the Guarantee Agreement by a U.S. court was appropriate in light of subsection (e) of the May 27

---

[7]      CTIM sought *in personam* jurisdiction over the Guarantors, all of whom are Mexican citizens residing in Mexico, based on the provisions in the Loan Documents by which the Guarantors consented to jurisdiction in New York to enforce the Guarantee Agreement.

Order, which provides, "[t]he execution of additional guarantees established in the Guarantee

Agreement in case of bankruptcy is suspended, whose responsibility of its credits is trying to be

extended to the principal's shareholders (Pablo Ignacio Gonzalez Carbonell) by reason of the

bankruptcy request."  Herrera Decl., Ex A-1 at 4.  Specifically, the District Court held that the

May 27 Order "suspends the execution of the guarantees established in the Agreement."

*Carbonell*, 2012 WL 92359, at *4.  In deciding to extend comity to the May 27 Order, the

District Court relied only on subsection (e) of the May 27 Order.

       The issue before this Court is whether CTIM, as special servicer on behalf of secured

creditors, may proceed with its adversary proceeding to recover the funds in the Cash

Management Account in New York, notwithstanding subsection (a) of the May 27 Order which

prohibits CTIM from recovering any funds in the Cash Management Account.  The bankruptcy

court has *in rem* jurisdiction over the funds on deposit in New York.  The Foreign Representative

asserts that the May 27 Order should be recognized and given effect; CTIM disputes this

contention.  The issue—whether CTIM could exercise its rights as a secured creditor to the Non-

Debtor Affiliates' funds in the Cash Management Account in New York—was not presented to

or decided by the District Court.  Therefore, the Court concludes that preclusion does not prevent

this Court from considering whether to grant comity to subsection (a) of the May 27 Order.

       Moreover, the District Court's ruling was based on this Court having granted recognition

to the Concurso Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy

Code.  *Carbonell*, 2012 WL 92359, at *4-5.  Section 1517(d) permits the Court to modify or

terminate the Recognition Order "if it is shown that the grounds for granting it were fully or

partially lacking or have ceased to exist . . . ."  11 U.S.C. § 1517(d).  Under section 1518, the

Foreign Representative "shall file with the court promptly a notice of change of status

16

concerning (1) any substantial change in the status of such foreign proceeding . . . ." *Id.* §
1518(1).  While the Foreign Representative has not filed a notice of change of status of the
Concurso Proceeding, the Court was advised by CTIM on September 14, 2012 that the Concurso
Proceeding has been "suspended."[8]  September 14, 2012 Hr'g Tr. at 63:11-19.  The precise effect
of the suspension is unclear, as is whether a change in recognition is warranted as a result.  Since
this Court is expressly provided with the authority to modify or terminate recognition, the
District Court's Comity Ruling predicated on recognition should not preclude this Court's
determination whether to extend comity to a different provision of the May 27 Order.

Furthermore, the District Court had no reason to consider the relevant provisions of
Chapter 15 that this Court must take into account before granting the relief sought by the Foreign
Representative.  Section 1522(a) provides that "[t]he Court may grant relief under section 1519
or 1521, or may modify or terminate relief under subsection (c), only if the interests of the
creditors and other interested entities, including the debtor, are sufficiently protected."  *Id.* §
1522(a).  Section 1522(c) gives a court the power, "at the request of the foreign representative or
an entity affected by relief granted under section 1519 or 1521, *or at its own motion*, [to] modify
or terminate such relief."  *Id.* § 1522(c) (emphasis added).  "The purpose this section is to ensure
a balance between the relief that may be granted to the foreign representative and the interests of
the persons potentially affected by such relief."  8 COLLIER ON BANKRUPTCY 1522.01.  As the
legislative history makes clear, "[Section 1522] gives the bankruptcy court broad latitude to mold
relief to meet specific circumstances, including appropriate response if it is shown that the
foreign proceeding is seriously and unjustifiably injuring United States creditors."  H.R. Rep.
No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005).

---

[8]    The Foreign Representative is hereby directed to file in this Court within 30 days from the date of this order
a notice setting forth the current status of the Concurso Proceeding pursuant to section 1518(2) of the Bankruptcy
Code.

**B. Section 1509 Does Not Direct a Court to Grant Comity to a Foreign Court Order Just Because a U.S. Court Grants Recognition to a Foreign Proceeding**

The District Court based its Comity Ruling on this Court's Recognition Order and on section 1509 of the Bankruptcy Code. The District Court found that section 1509 *required* that comity be granted to the May 27 Order. *Carbonell*, 2012 WL 92359, at *4 (asserting "[o]nce a foreign proceeding has been recognized by a U.S. bankruptcy court, it is mandatory that U.S. courts extend comity to a foreign representative's request for a grant of comity unless granting such request would contravene U.S. public policy").

Section 1509 is entitled "Right of Direct Access."[9] The language of the section, its legislative history and its original source in the UNCITRAL Model Law, all make clear that section 1509 reflects an "access" principle assuring that a foreign representative—"subject to any limitations that the court may impose consistent with the policy of this chapter," 11 U.S.C. § 1509(b) —may sue or be sued in a court in the United States, *id.* § 1509(b)(1), and may apply directly to a court in the United States for appropriate relief in that court, *id.* § 1509(b)(2). "[A] court in the United States shall grant comity or cooperation *to the foreign representative*." *Id.* § 1509(b)(3). But nothing in section 1509 commands that comity shall be given to all orders entered by a foreign court in a foreign insolvency proceeding. In short, other than providing

---

[9]     Section 1509 is entitled "Right of direct access." Subsection (b) states:

> (b) If the court grants recognition under section 1517, subject to any limitations that the court may impose consistent with the policy of this chapter—
>
> > (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
> >
> > (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
> >
> > (3) a court in the United States shall grant comity or cooperation *to the foreign representative*.

11 U.S.C. § 1509(b) (emphasis added).

access to courts in the United States, section 1509 is not a self-executing relief section of Chapter 15.  Relief to a foreign representative must be based on sections 1507, 1519, 1520 and 1521, subject to limitations that may be imposed under section 1522.

Once recognition is granted under section 1517, "a court in the United States shall grant comity or cooperation *to the foreign representative*," although such a grant is "subject to any limitations that the court may impose consistent with the policy of this chapter."  11 U.S.C. § 1509(b) (emphasis added).  "While this provision [Section 1509(b)] mandates courtesy and respect for the foreign proceeding, consistent with the statement of purpose of chapter 15 and its international origin, it does not mandate relief.  The foreign representative must still make a case that the relief it seeks is warranted."  8 COLLIER ON BANKRUPTCY ¶ 1509.02.  "While recognition of the foreign proceeding turns on the objective criteria under § 1517, 'relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity.'"  *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (quoting *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008)).  "Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity."  *Id.* (quoting *Atlas Shipping,* 404 B.R. at 738).

"As each section of Chapter 15 is based on a corresponding article in the Model Law, if a textual provision of Chapter 15 is unclear or ambiguous, the Court may then consider the Model Law and Foreign interpretations of it as part of its interpretive task."  *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 624 (Bankr. S.D.N.Y. 2010) (internal quotation marks omitted).  "In addition, the Court should read Chapter 15 consistently with prior law under section 304."  *Id.* (citing *Atlas Shipping*, 404, B.R. at 738-39).

19

Like section 1509, Article 9 of the United Nations Commission on International Trade Law on Cross Border Insolvency ("UNCITRAL" or "Model Law"), is also entitled "Right of direct access," and is located in Chapter II entitled "Access of Foreign Representatives and Creditors to Courts in this State." Article 9 of the Model Law simply states that "[a] foreign representative is entitled to apply directly to a court in this State." UNCITRAL, *Model Law on Cross-Border Insolvency*, Part one, Chpt. II, *Art. 9 (Right of direct access)* (1997) (available at http://www.uncitral.org/pdf/english/texts/insolven/insolvency-e.pdf). The Guide to Enactment of the Model Law, included with the published text of the Model Law, explains that "Article 9 is limited to expressing the principle of direct access by the foreign representative to courts of the enacting State, thus freeing the representative from having to meet formal requirements such as licences or consular action." *Id.,* Part two, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ("Guide to Enactment") ¶ 93.

The principle of direct access does not dictate the relief that must be accorded to the foreign representative. Article 20 of the Model Law, implemented in section 1520 of the Bankruptcy Code, provides for certain "mandatory relief" upon recognition as a foreign main proceeding, *see infra* n.12, but any further relief is discretionary. "In addition to the mandatory stay and suspension [provided in Article 20], the Model Law authorizes the court to grant 'discretionary' relief for the benefit of any foreign proceeding, whether it is a 'main' proceeding or not (article 21). Such discretionary relief may consist of, for example, *staying proceedings* or suspending the right to encumber assets . . . and any other relief that may be available under the laws of the enacting State." *Id.,* Guide to Enactment ¶ 34 (emphasis added).[10]

---

[10] The United Nations has published a Judicial Guide to application of the Model Law. With respect to the access principle, the Judicial Guide explains:

    A. the "access" principle

The District Court stated that "[o]nce a foreign proceeding has been recognized by a U.S. bankruptcy court, it is mandatory that U.S. courts extend comity to a foreign representative's request for a grant of comity unless granting such request would contravene U.S. public policy." *Carbonell*, 2012 WL 92359, at *4. In support of this conclusion the District Court relied on *In re Qimonda AG Bankr. Lit.*, 433 B.R. 547, 565 (E.D. Va. 2012). The district court in *Qimonda* focused on the words "shall grant comity or cooperation to the foreign representative" in section 1509(b)(3), and apparently concluded based on this language that a court must grant comity, not only to the foreign representative but also to either *a foreign law or a foreign court's order* upon request by the foreign representative.

Granting comity to a *foreign representative* by providing access to courts in the United States is very different from granting *the request* by the foreign representative to extend comity to a foreign law, court order or judgment. *Qimonda* did not cite any authority for the broader

---

29. The UNCITRAL Model Law envisages a proceeding being opened by an application made to the receiving court by an insolvency representative of a debtor who has been appointed in another State—the "foreign representative". The application may seek:

     (a) To commence an insolvency proceeding under the laws of the enacting State;

     (b) Recognition of the foreign proceeding in the enacting State, so that the foreign representative may:

          (i) Participate in an existing insolvency proceeding in that State;

          (ii) Apply for relief under the Model Law; or

          (iii) To the extent that domestic law permits, intervene in any proceeding to which the debtor is a party.

UNCITRAL Model Law on Cross-Border Insolvency: The Judicial Perspective, III. Interpretation and application of the UNCITRAL Model Law ¶ 29 (United Nations 2012) (footnotes omitted) (available at http://www.uncitral.org/pdf/english/texts/insolven/V1188129-Judicial_Perspective_ebook-E.pdf) (last visited Nov. 12, 2012).

proposition that extending comity to foreign laws or court orders is required so long as that relief

is not "manifestly contrary to the public policy of the United States," the limitation imposed by

section 1506.  If *Qimonda* were correct that comity is *required* to be given to any foreign law,

court order or judgment that is not manifestly contrary to U.S. public policy, there would be no

point in having the foreign representative "apply" to a U.S. court for discretionary relief.[11]  The

only issue left open would be whether the requested relief is manifestly contrary to the public

policy of the United States in violation of section 1506, leaving no room for the exercise of

discretion; nothing about Chapter 15 supports such an interpretation.

     The relief requested by the Foreign Representative—a stay of the adversary proceeding—

is available, if at all, under sections 1507 or 1521(a)(7).[12]  Because section 1521 would permit

the relief sought by the Foreign Representative, it is unnecessary to look to section 1507 for such

authority.  *See Atlas Shipping*, 404 B.R. at 741 (concluding that it was unnecessary to determine

whether "additional assistance" was available under section 1507).  Granting relief to the Foreign

---

[11]    *Qimonda* is puzzling in several respects.  The district court in reviewing the decision of the bankruptcy court to grant comity to German law stated that that an abuse of discretion standard applied for decisions committed to the discretion of the bankruptcy court.  *Qimonda*, 433 B.R. at 555.  Furthermore, according to the district court, the abuse of discretion standard applies when a lower court decides to defer to a foreign law under comity principles.  *Id.* at 556.  But the district court then stated that the parties unnecessarily "spill much ink" regarding whether comity should be granted when, according to the district court, the parties' "arguments are unpersuasive because they address the issue already decided by Congress in § 1509, namely whether courts must grant comity . . . ."  *Id.* at 564-65.  The "abuse of discretion" standard of review obviously cannot apply to an issue as to which the court lacks any discretion because the result is mandated by Congress.  This Court does not believe that section 1509 can be read as removing the discretion that sections 1507, 1519, 1520 and 1521 expressly provide the bankruptcy court in determining whether to grant relief.

[12]    The effects of recognition of the Concurso Proceeding as a foreign main proceeding are set forth in section 1520.  Sections 361 and 362 are made applicable to property of the debtor that is within the United States.  But section 362(d)(1) is therefore applicable and permits a bankruptcy court to lift the automatic stay if a creditor is not adequately protected.  This express statutory authority for a bankruptcy court to allow a creditor to obtain relief from property of the debtor within the United States (by lifting the automatic stay) appears to trump continued protection of property based on international comity.  Protection of property of a non-debtor affiliate may be provided under section 1521(a)(7) only if creditors are "sufficiently protected," as provided in section 1522(a).  It would be ironic, to say the least, if property of a non-debtor affiliate received greater protection than property of the debtor.

Representative under section 1521(a)(7) depends on whether "the interests of the creditors . . .

are sufficiently protected."[13]  11 U.S.C. § 1522(a).  At least with respect to the funds belonging

to the Non-Debtor Affiliates remaining in the Cash Management Account, the Court concludes

that CTIM is sufficiently protected as a temporary matter as long as the funds remain in the

United States.  CTIM may be dissatisfied with the status, pace or a ruling in the Concurso

Proceeding, but that alone does not justify permitting CTIM to proceed with its adversary

proceeding in this Court.

But the *status quo* is also unsatisfactory.  The Foreign Representative acknowledged that

not all of the funds remaining in the Cash Management Account may be subject to the

Precautionary Measures.  *See* September 14 Hr'g Tr. at 14:7-20:6.  CTIM is entitled to a

determination of the funds that are *not* subject to the Precautionary Measures.

In *JP Morgan Chase Bank v. Altos Hornos De Mexico*, *S.A.*, 412 F.3d 418 (2d Cir. 2005),

a pre-Chapter 15 case, the Second Circuit addressed the Circuit's prior decision in *Koreag*,

*Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag),* 961 F.2d 341, 349 (2d Cir.

1992)*,* and reformulated the circumstances that make it appropriate for a U.S. court to defer to a

foreign insolvency court to decide issues concerning the treatment of property within the United

States.  The *Altos Hornos* court stated:

> On this appeal we are asked to clarify the scope of our
> holding in *Koreag, Controle et Revision S.A. v. Refco F/X Assocs.,
> Inc. (In re Koreag),* 961 F.2d 341, 349 (2d Cir.1992), where we
> ruled that the ownership of property a debtor claims as part of its
> estate in a foreign bankruptcy proceeding is a question "antecedent
> to the distributive rules of bankruptcy."  Local courts may resolve

---

[13]    Relief might also be possible under section 1521(a)(1)—"staying the commencement or continuation of an
individual action or proceeding concerning the debtor's assets, rights, obligations . . . "—to the extent the
Precautionary Measures affect the Debtor's property.  The dispute here appears to be limited to the Non-Debtor
Affiliates' funds in the Cash Management Account, and the Precautionary Measures extend protection to property of
the Non-Debtor Affiliates so section 1521(a)(7) is necessary for the Foreign Representative to obtain the requested
relief.

> the question because international comity does not require
> deference to the parallel foreign bankruptcy proceeding in such
> circumstances. *Id.* at 349.    The rule announced in *Koreag,*
> however, only applies to disputes that present a *bona fide* question
> of property ownership.    It has no application to disputes like this
> one where a bankruptcy creditor claims to own assets but has a
> contractual obligation to use those assets to pay down the same
> debt that is the subject of a foreign bankruptcy proceeding.  In such
> a case, local courts are displaced and must defer to the foreign
> proceeding.      We therefore affirm the district court's order
> dismissing appellant's complaint on international comity grounds.

*Id.* at 420.

The decisions in *Altos Hornos* and *Koreag* allow a U.S. court to determine ownership of

property in the United States that is subject to a *bona fide* question of property ownership arising

under U.S. law.  Here, some (undetermined) portion of the funds in the Cash Management

Account is property of the Non-Debtor Affiliates, and some of those funds may not be subject to

the Precautionary Measures.  But unlike the situations in *Altos Hornos* or *Koreag*, the

Precautionary Measures on their face extend protection to the Non-Debtor Affiliates' funds in

the Cash Management Account.  In such circumstances, the Court believes that the Quintana Roo

District Court is the more appropriate forum to sort out these issues if it chooses to do so in a

timely fashion.  Additionally, changed circumstances may support modification or termination of

the Precautionary Measures by the Quintana Roo District Court.[14]  The Foreign Representative's

counsel conceded (after conferring with the Foreign Representative's Mexican counsel who was

---

[14]      The Precautionary Measures prohibit CTIM from reaching the Non-Debtor Affiliates' funds in the Cash Management Account.  Nothing in the Precautionary Measures relieved the Non-Debtor Affiliates from the obligation to continue making debt service payments on the $103 million loan.  Nevertheless, for more than two years, the Non-Debtor Affiliates have simply stopped paying.  In a Chapter 11 case, failure to make post-petition payments on secured debt may result in lifting of the automatic stay.  The Quintana Roo District Court could consider whether the Non-Debtor Affiliates' failure to make any debt service payments are changed circumstances that support modifying or terminating the Precautionary Measures.

present in court during the hearing) that the Quintana Roo District Court can modify the

Precautionary Measures based on changed circumstances.  September 14 Hr'g Tr. at 45:8-47:17.

CTIM argues that the stay relief sought by the Foreign Representative is manifestly

contrary to public policy in violation of section 1506.  The only authority CTIM cites for support

is the bankruptcy court decision in *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117 (Bankr. N.D. Tex.

2012), which is currently pending on direct appeal to the Fifth Circuit.  Whatever the outcome of

that appeal, it is clear that the stay relief sought by the Foreign Representative is not manifestly

contrary to public policy.  The issues in this case—at least at this time—are whether this Court or

the Quintana Roo District Court that issued the Precautionary Measures should determine the

reach of the May 27 Order, and whether any changed circumstances support modifying or

terminating the relief granted by the Quintana Roo District Court.  As the District Court correctly

concluded in *Carbonell*, 2012 WL 92359, at *5, the type of relief provided in the Precautionary

Measures is consistent with the type of relief granted by U.S. courts under appropriate

circumstances.  *Id.* ("As Plaintiff [CTIM] recognizes, U.S. bankruptcy courts have, as the May

27th Order does, suspended actions against non-debtor parties in order to assist in, and maintain

the integrity of, the administration of a debtor's bankruptcy case." (citations omitted)).

Precautionary Measures extending protection to non-debtor affiliates may be important and

appropriate in providing a debtor with a respite from creditors and a chance to reorganize.  Far

different issues may be presented by a foreign court's final order impairing the rights of U.S.

creditors, particularly when those creditors' claims are governed by U.S. law and are against

non-debtor affiliates for property in the United States.[15]  The much-awaited Fifth Circuit decision

---

[15]        The appeal in *Vitro* centers on whether the bankruptcy court was correct in refusing to grant comity to the
provisions in the Mexican concurso plan approved by the Mexican insolvency court that invalidated guarantees to
creditors by non-debtor affiliates.  The bankruptcy court in *Vitro* did *not* analyze whether sections 1507 or 1522

in *Vitro* may shed more light on such issues, but such issues are not presented by the Precautionary Measures because they were not a final disposition of claims against the Non-Debtor Affiliates.  With that said, however, the question remains whether conditions should be imposed on any stay granted here, which will be dealt with separately below.

While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws, court orders and judgments—consistent with over a hundred years of comity precedent—when unique circumstances warrant it, so long as "the interests of the creditors . . . are sufficiently protected." 11 U.S.C. § 1522(a).  Furthermore, courts *must* deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States.

### C.  Comity Should Be Extended to the May 27 Order

The issue here is whether a stay of the adversary proceeding should be granted pursuant to section 1521(a)(7) based on international comity.  A central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings.  Comity is not defined in Chapter 15 but it pervades the statute.  The Model Law upon which Chapter 15 is based emphasizes the importance of comity, but fails to define it.  Section 304 of the Bankruptcy Code, the predecessor of Chapter 15, likewise called upon courts to apply international comity.  The comity doctrine has been extensively analyzed in both bankruptcy and non-bankruptcy cases.[16]  A review of traditional comity principles is useful.

---

provide authority to refuse to grant comity to aspects of the concurso plan even if the provisions in question are not manifestly contrary to public policy.

[16]    Whether Chapter 15 changes the calculus for granting, denying, limiting or conditioning the application of comity remains an open question.  Sections 1507(b)(1)-(5) and 1522(a) and (c) arguably limit application of comity, allowing a court to reject application of comity in circumstances that might previously have supported its

Comity decisions arising under section 304, the predecessor to Chapter 15, provide useful precedents for the application of comity under the current Chapter 15 regime.  Section 304's legislative history suggests the doctrine of comity was a late addition to section 304 to provide judges with flexibility in dealing with ancillary cases related to foreign insolvency proceedings. *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB,* 773 F.2d 452, 456 (2d Cir.1985) (explaining that section 304(c) "was subsequently amended before passage in order expressly to direct the bankruptcy court to consider comity when evaluating a petition under section 304").  Section 304's legislative history states that "[p]rinciples of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules."  *Id.* at 455 (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 324-25, *reprinted in* 1978 *U.S. Code Cong. & Ad. News* 5963, 6281).

As stated in *Hilton v. Guyot*, 159 U.S. 113 (1895), comity is not an "absolute obligation." *Id.* at 164.  However, the "doctrine has never been well defined."  *Altos Hornos*, 412 F.3d at 423. Modern courts have suggested comity may include two distinct doctrines: "a canon of construction, it might shorten the reach of a statute," and "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Maxwell Commc'n Corp. v. Societe Generale (In re Maxwell Commc'n Corp.)*, 93 F.3d. 1036, 1047 (2d Cir. 1996).

"Comity takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently

---

application.  "Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise." *Maxwell*, 93 F.3d at 1047.  It is unnecessary here to explore this issue further as the Court concludes that the relief ordered by the Court would be appropriate in any event.

functioning rules of international law." *Atlas Shipping*, 404 B.R. at 733 (quoting *In re Artimm,*

*S.r.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) (citing *Maxwell*, 93 F.3d at 1048)).  "Federal

courts generally extend comity whenever the foreign court had proper jurisdiction and

enforcement does not prejudice the rights of United States citizens or violate domestic public

policy." *Atlas Shipping*, 404 B.R. at 733 (quoting *Victrix S.S. Co., S.A v. Salen Dry Cargo A.B.*,

825 F.2d 709, 713 (2d Cir. 1987)).  As the court stated in *Altos Hornos*, "deference to the foreign

court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not

contravene the laws or public policy of the United States." *Altos Hornos*, 412 F.3d at 424.  In

analyzing procedural fairness, courts have looked to the following nonexclusive factors:

> (1) Whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the rights to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign country's insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.

*Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 249 (2d Cir. 1999).[17]

---

[17]    Choice-of-law principles and conflicts of law are important in deciding whether to extend comity to foreign law, court orders or judgments where there is an actual conflict between substantive legal rules in jurisdictions with an interest in the pending matter.  *See Maxwell*, 93 F.3d at 1046-48, and cases cited therein.  Respect for generally recognized choice-of law rules may also play a role in determining whether decisions of foreign courts satisfy requirements for procedural fairness before extending comity to foreign laws, court orders or judgments. Surprisingly few court decisions have followed the clear lead in *Maxwell* and analyzed choice-of-law principles in deciding whether to extend comity, instead deciding the issues on other bases. *See Qimonda*, 433 B.R. 547 (not including any choice of law analysis in evaluating whether to apply German patent law); *but see In re Toft*, 453 B.R. 186, 196 (Bankr. S.D.N.Y. 2011) (Gropper, J.) ("In many cases, these provisions would appear adequate to resolve a dispute arising from a conflict between U.S. and foreign law, and the public policy exception would not have to be invoked.  It also appears patent that relief should not be granted or denied in a cross-border case where there is a conflict between U.S. and foreign law without a conflict of law analysis—*i.e.,* should U.S. or foreign law be applied

"The Second Circuit has frequently underscored the importance of judicial deference to foreign bankruptcy proceedings." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 624 (Bankr. S.D.N.Y. 2010) (citing *Finanz AG Zurich,* 192 F.3d at 246; *Maxwell,* 93 F.3d at 1048; *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 994 F.2d 996, 999 (2d Cir. 1993); *Cunard,* 773 F.2d at 458). In *Altos Hornos*, the Second Circuit extended comity and deferred to a Mexican court to decide the underlying issues, despite the secured lender's argument that so doing would be procedurally unfair because of a six-year delay in resolving Altos Hornos's debts, and despite a governing New York choice of law and choice of forum provision. 412 F.3d at 428-29.

1. *A Stay Should Be Granted to Permit the Quintana Roo District Court to Decide the Pending Issues*

In this case, some of the funds in the Cash Management Account are property of the Debtor; some of the funds are property of the Non-Debtor Affiliates. With respect to the funds belonging to the Non-Debtor Affiliates, the Foreign Representative acknowledged that some of those funds might be subject to the Precautionary Measures and some not. The parties have not agreed on the correct allocation of the funds. Absent an agreement between the parties, an evidentiary hearing will be required to resolve these disputes. The question now is whether the Quintana Roo District Court that entered the May 27 Order should resolve the open issues which derive from that order. *Maxwell*, 93 F.3d at 1047 (recognizing that comity involves "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case

---

to a particular issue based on familiar choice of law principles coupled with (where appropriate) due regard for the principle of comity.").

At this stage of this case, the issue is whether this Court should extend comity (deference) to permit the Quintana Roo District Court to address the issues regarding the Precautionary Measures; *Maxwell* and *Altos Hornos* strongly counsel that it should. *See infra* n.16. The Court is *not* required to resolve whether choice-of-law principles should lead a court (here or in Mexico) to apply New York law regarding enforcement of CTIM's security interest in the Non-Debtor Affiliates' funds in the Cash Management Account in New York. Even if the security interest should be enforced, a stay of the exercise of enforcement rights is an available remedy under U.S. bankruptcy law.

properly adjudicated in a foreign state"), and *Altos Hornos*, 412 F.3d at 424, both strongly

counsel that deference should be provided to the Quintana Roo District Court to resolve these

issues.[18]  The Quintana Roo District Court entered the May 27 Order on an *ex parte* basis.  CTIM

chose to challenge the May 27 Order through the separate *amparo* proceeding, and it has never

appeared in the Quintana Roo District Court seeking to vacate or modify the order.  Granting

comity to foreign courts does not depend on the willingness of one party to participate in a

foreign proceeding, at least where the parties may be made subject to the jurisdiction of the

foreign court.

       2.   *Nothing in the Record Supports CTIM's Argument About Procedural Unfairness*

One last point must be discussed.  CTIM has been critical of the Quintana Roo District

Court proceeding from the start.  The criticism seems more appropriately leveled at Cozumel

Caribe and the Foreign Representative, rather than at the Quintana Roo District Court.  The

Precautionary Measures were obtained *ex parte*; that is not uncommon in our courts as well.  The

initial order entered by the Quintana Roo District Court required that it be served on CTIM,

among other parties; that too would be commonplace for *ex parte* orders issued by our courts.

Due process is not violated by the entry of *ex parte* orders, provided that notice and an

---

[18]      The court in *Altos Hornos* stated:

> International comity . . . involves not the choice of law but rather the discretion of a
> national court to decline to exercise jurisdiction over a case before it when that case is
> pending in a foreign court with proper jurisdiction.  We have repeatedly held that U.S.
> courts should ordinarily decline to adjudicate creditor claims that are the subject of a
> foreign bankruptcy proceeding.  Since [t]he equitable and orderly distribution of a
> debtor's property requires assembling all claims against the limited assets in a single
> proceeding, American courts regularly defer to such actions.  In such cases, deference to
> the foreign court is appropriate so long as the foreign proceedings are procedurally fair
> and (consistent with the principles of Lord Mansfield's holding) do not contravene the
> laws or public policy of the United States.

412 F.3d at 424 (internal quotation marks and citations omitted).

opportunity to appear and defend are promptly given.  Cozumel Caribe did not promptly serve

the order on CTIM, which learned of the May 27 Order in a letter from counsel to Cozumel

Caribe.  At the hearing in this case, CTIM acknowledged that the May 27 Order was finally

served on it in or around July 2010.  September 14, 2012 Hr'g Tr. at 7:16-8:6.  CTIM chose not

to challenge the order in the Quintana Roo District Court even after being served; instead, CTIM

commenced a separate *amparo* proceeding in a different Mexican court, ultimately with the

unsatisfying result (for CTIM) of dismissal of the proceeding.  The parties dispute the effect of

that final disposition, but that issue need not be resolved here.

In addition to failing to timely serve the Precautionary Measures, the Debtor or its Non-

Debtor Affiliates engaged in other questionable conduct.  CTIM brought its action in the District

Court against the non-debtor Guarantors.  *Carbonnel*, 2012 WL 92359, at *1 ("On September 13,

2010, plaintiff CT Investment Management Co., LLC, in its capacity as special servicer and

attorney-in-fact for Bank of America, National Association, as successor by merger to LaSalle

Bank National Association, as trustee for the Noteholders . . . commenced the instant action

against defendants Pablo Gonzalez Carbonell and Grupo Costamex, S.A. de C.V. . . . alleging

breach of contract under a guaranty agreement (the 'Agreement') entered into in connection with

the development and operation of several resort properties and hotels in Mexico.")  Carbonell

and Grupo Costamex did not appear and CTIM sought to have a default judgment entered.  *Id.*

Carbonell and Grupo Costamex had consented to New York court jurisdiction in the Guarantee

Agreement.[19]  (*See* ECF Doc. # 38, Ex. D at 12.)  Instead of the Guarantors defending the action,

---

[19]       The existence of a choice of law and forum selection clause does not prevent staying a matter in favor of a
foreign forum based on comity.  *See Allstate Life Ins. Co.,* 994 F.2d at 1000 ("Appellants emphasize the presence of
a forum selection and choice of law clause in the Indenture Agreement which selects New York as a forum and New
York law to govern the agreement.  Appellants contend that this clause indicates that the court abused its discretion
in granting comity in favor of the Australian proceedings.  The presence of such clauses, however, does not preclude
a court from granting comity where it is otherwise warranted.").

the Foreign Representative appeared arguing for a stay based on the Precautionary Measures. (*See* ECF Doc. # 38 at 4.)  After the District Court Action was stayed, the Guarantors commenced an action in still another Mexican court seeking to invalidate the Guarantee Agreement.  They reportedly served their complaint on a teller in a Bank of America branch in Chicago, rather than serving CTIM (or Bank of America through more appropriate means), and when no one appeared in the Mexican action, the Guarantors obtained a default judgment invalidating the Guarantee Agreement.  *Id.*  If the default judgment withstands challenge in the Mexican courts, a court in the United States may ultimately have to decide whether the judgment can be enforced in this country should enforcement be sought.[20]  While these circumstances have no direct bearing on the issues here, the Court cannot help but be influenced by this alleged conduct in deciding whether or how to exercise its discretion in granting the relief sought by the Foreign Representative.

CTIM has so far avoided appearing in the Quintana Roo District Court that entered the order that has given rise to so much controversy.  But that is the court that should address the issues in the first instance.  Section 1522 permits this Court to impose conditions on relief, and that is what the Court will do.  Therefore, the Court will stay the adversary proceeding for a period of 180 days from the date of this order.  The stay is expressly conditioned on the following:

---

[20]        In *Hilton v. Guyot,* the Supreme Court held that if the foreign forum provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the judgment should be enforced and not "tried afresh."  *Hilton,* 159 U.S. at 202-03; *see also Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 698.

1. Within 60 days from the date of this order, the Debtor and Foreign Representative shall commence an appropriate proceeding in the Quintana Roo District Court seeking a determination (i) whether the Precautionary Measures apply to all of the funds in the Cash Management Account, and, if not, what is the amount of funds *not* covered by the Precautionary Measures, and (ii) whether, because of changed circumstances, the Precautionary Measures should be modified or terminated;

2. In commencing that proceeding, the Debtor or Foreign Representative must *promptly* serve CTIM with such process as is necessary under Mexican law;

3. CTIM shall advise this Court within 14 days after the Mexican proceeding is commenced whether CTIM will consent to the jurisdiction of the Quintana Roo District Court to decide the issues addressed in this order; and

4. If, for any reason, the Quintana Roo District Court declines to hear and decide the issues identified in this order within 180 days, the parties shall so advise this Court.  In that event, the Court will determine whether to maintain the stay of the adversary proceeding.[21]

The Precautionary Measures approved *ex parte* by the Quintana Roo District Court included a requirement that the funds in the CTIM account be returned to Mexico.[22]  The Foreign Representative has never pressed this aspect of the Precautionary Measures, but to make the

---

[21]    While deference to a foreign court may be appropriate, courts in the U.S. may proceed to decide issues relevant to cases before them if the foreign court declines to decide the matter.  *See International Banking Corp.*, 439 B.R. at 629 ("Accordingly, the Court directs the parties to consent to the jurisdiction of the Bahraini court to decide the voidability of the Attachment Orders, and further directs them to seek a ruling from the Bahraini court as to the voidability of the Attachment Orders under Bahraini law.  In the event that the Bahraini court declines to exercise jurisdiction, this Court will decide the dispute. . . .  Finally, the parties should schedule a conference to be held approximately 90 days after the date of this order to report on their progress.").

[22]    Subsection (c) of the May 27 Order directs that "the total balance of the Cash Management Account . . . be placed by the current depository available for its owners (Cozumel Caribe, S.A. DE C.V. and its affiliates) for the purpose of its preservation in a sight deposit in the national territory until a conciliator . . .  is appointed."  Herrera Decl., Ex. A-1 at 3.

matter clear, the Court concludes that CTIM would not be sufficiently protected if the funds in the Cash Management Account—all of which are covered by a perfected security interest governed by New York law—were returned to Mexico absent further order of this Court.

### III.   CONCLUSION

For the foregoing reasons, the motion of the Foreign Representative for a stay of this adversary proceeding is **GRANTED** on the conditions set forth in this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

Dated:     November 14, 2012
         New York, New York

                        *____Martin Glenn_____*
                               MARTIN GLENN
                 United States Bankruptcy Judge